UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BUNZL DISTRIBUTION USA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No. 4:05CV605 JCH |
| | ) | |
| JOHN SCHULTZ, MARCIA SCHULTZ, | ) | |
| ALLEN SCHULTZ, JANE SCHULTZ, and | ) | |
| GRAYMARK TISSUE COMPANY, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on a number of motions. The case arises out of a tissue paper

distribution arrangement between Plaintiff, Defendants, and various tissue manufacturing companies.


## BACKGROUND

Defendant Graymark Tissue Company is a wholesaler of tissue paper products. (Complaint,

Doc. No. 1, ¶ 12). Graymark is owned and controlled by Defendants John Schultz, Marcia Schultz,

Allen Schultz, and Jane Schultz (the "Schultz Defendants," all defendants collectively referred to as

"Graymark"). (Complaint, Doc. No. 1, ¶ 12). Bunzl Distribution is a distributor of products,

including tissue paper products. (Counterclaim, Doc. No. 21 ¶ 6).

In 1992, the Schultz Defendants owned and operated Shelby Tissue, a paper mill, and supplied

Bunzl with toilet tissue products. (Schultz Affidavit, Doc. No. 42, attached exh. ¶ 6). Shelby Tissue

also supplied a company named Economy Cash & Carry. (Schultz Affidavit, Doc. No. 42, attached

1

exh. ¶ 8).  Shelby Tissue agreed to allow Bunzl to participate in its relationship with Economy, or,

as Defendants assert, "Shelby would risk losing Bunzl Distribution's accounts in the Southwest."  (Id.

¶¶ 10-12).  In 1998 the Schultz Defendants formed Graymark Tissue, which was also involved in the

distribution arrangement with Shelby, Economy, and Bunzl.  (Id. ¶ 13).

In January 2003, Graymark entered into an oral agreement (the "January 2003 agreement")

with Bunzl and a number of tissue manufacturers.[1]  (Id. ¶ 20).  Under the agreement Graymark would

---

[1] Defendant John Schultz describes the circumstances leading up to the January 2003 agreement:

17.    Over the next several years [between 1998 and 2003], Paul Lorenzini [CEO of Bunzl] and other top executives of Bunzl consistently and frequently assured us that Bunzl would "looked after" [sic] and "take care of" us because of the beneficial, long-standing relationship we had built with Bunzl over the years.  We were assured that we would always have a place with the organization.

18.    During this period, both Allen Schultz and I made frequent trips to Bunzl's facilities in Missouri to give various reports, attended meetings and participated in Bunzl's social events.  The relationship we had with Bunzl was such a close and intimate one that we often stayed at the homes of Bunzl executives and officers when we came to visit Missouri.

19.    Through the relationship, Bunzl enjoyed the benefit of outsourcing the difficult aspects of managing its supply chain, a critical component of its business operations – at greater corporate profits and at virtually no cost to itself – while maintaining a strong relationship with us.

20.    We also shared our fifty-plus years of experience in the paper product industry, and our confidential information including our acquired knowledge of the industry and exclusive network of suppliers with whom we had established significant business relationships over the years.

21.    Our arrangement with Bunzl continued through January 2003, at which time we and Bunzl modified the nature of the supply arrangement.  Our business and relationship with Economy had grown significantly from the time it began and represented approximately eighty (80) percent of our business.

22.    Conversely, our business with Bunzl was shrinking, and our relationship with Bunzl was costing Economy and Graymark Tissue too much money (in the form of rebates, markups, and discounts) to conduct business.  Significantly, Bunzl was

2

act as a middleman between Bunzl and the tissue manufacturers, Green Bay, Roses, and Cellynne. (Id. ¶ 20-23). Bunzl would place orders for products to Graymark. Graymark would then order the products from the manufacturers (also referred to as "vendors"). Bunzl would pay Graymark for the orders, and Graymark would then pay the manufacturers. (Id. ¶ 20-23). Under the agreement, the vendors paid a six percent rebate to Graymark based on the vendors' net sales to Graymark. (Zatkulak Affidavit, Doc. No. 29, attached exh. A, ¶7). Graymark would then pay a three percent rebate to Bunzl and keep the remaining three percent as a commission. (Id. ¶ 8).

In connection with this oral agreement, Bunzl agreed in writing to guaranty amounts owed by Graymark to the manufacturers (the "Guaranties"). (Id. ¶ 9). The Schultz Defendants agreed, also in writing, to indemnify personally Bunzl for any amounts paid out under the Guaranties.[2] (Schultz

---

continuing to profit handsomely from the relationship in the meantime, despite not adding any value at all.

23. In an attempt to continue our relationship with Bunzl, [we met with Lorenzini, the Bunzl CEO] to discuss our state of affairs. At the meeting with Lorenzini, we explained the difficulties posed by the rising costs but carefully explained how much we valued our "partnership" with Bunzl. We stated, however, that we were concerned that the relationship had become too one-sided, and were therefore faced with the decision to either secure more business from Bunzl or resume working directly with Economy as we did prior to the arrangement.

24. ... Lorenzini instructed [two other Bunzl executives] to fix the situation within thirty (30) days.

25. Further, and in connection with the January 2003 meeting, Bunzl ... decided to contribute its "value" tissue program, a segment of its business dealing primarily with lower-cost tissue products, to us.

(Schultz Affidavit, Doc. No. 62, attached exh. A)

[2] Graymark asserts:

26. The Schultzes signed the indemnity agreement contrary to their own desire, and ultimately did so because neither the Schultzes nor Graymark Tissue had a choice. If

3

Affidavit, Doc. No. 42, attached exh. ¶ 25). Bunzl required Graymark to relocate its offices to New York. This required Graymark to purchase new furniture and equipment, and to incur $6,000 per month of overhead expenses. (Schultz Affidavit, Doc. No. 62, attached exh. A ¶ 33).

In 2004, the vendors expressed dissatisfaction with the arrangement. (Zatkulak Affidavit, Doc. No. 41, attached exh. C ¶ 11). Bunzl told Graymark that the January 2003 arrangement needed modification. (Schultz Affidavit, Doc. No. 42, attached exh. ¶ 38). Graymark provided a revised business plan, in which it relinquished its relationship with Green Bay and Roses, but made clear the importance of its relationship with Cellynne. (Id. ¶ 39). Bunzl told Graymark that Graymark would need to contact Cellynne to persuade it to continue the relationship with Graymark. (Id. ¶ 40). Bunzl then allowed the vendors to decide whether to continue working with Graymark, and told Graymark

---

the indemnity agreement was not executed then Graymark Tissue would have gone out of business, and its employees would have been released. At the same time, the Schultzes would have had absolutely no income and would have been unable to meet their financial obligations relating to the investments made in their business.

27. Throughout the years, Bunzl Distribution had unfairly exploited its relationship with Graymark Tissue to gain market dominance and to control Graymark Tissue's business arrangements. During this time, Bunzl Distribution obtained and used, without Graymark Tissue's consent, intimate knowledge of Graymark's operations, trade secrets, and confidential information, including information concerning Graymark's exclusive list of suppliers and vendors.

28. Bunzl Distribution's control of Graymark Tissue's operations were so pervasive that Bunzl Distribution was able to dictate, and indeed had dictated, with whom Graymark Tissue could do business (such as with the arrangement between Roses, Green Bay, and Cellynne).

28. Bunzl Distribution – through the pattern of control, dominance, and practices mentioned above – had nearly complete control over Graymark Tissue's daily operations and business agreements at the time that it demanded the Schultzes to execute the indemnity agreement.

(Schultz Affidavit, Doc. No. 42, attached exh.).

that it would need to convince the vendors to maintain the agreement if Graymark wanted the agreement to continue. (Zatkulak Affidavit, Doc. No. 41, attached exh. C ¶ 12-13). The vendors, including Cellynne, then decided that they no longer wished to continue under the 2003 agreement, and the oral agreement was terminated effective January 1, 2005. (Id. ¶ 14). After that date, Bunzl placed its orders directly with the vendors. (Id. ¶ 16).

In 2005, allegedly pursuant to the Guaranty, Cellynne demanded and Bunzl paid $500,000 owed to Cellynne by Graymark. This was for products delivered by Cellynne to Graymark, but never paid by Graymark. (Zatkulak Affidavit, Doc. No. 29, attached exh. A ¶ 10). Also allegedly pursuant to the Guaranty, Roses demanded and Bunzl paid $100,000 for products delivered but not paid. (Id. ¶ 11). In the fourth quarter of 2004, Bunzl purchased $4,747,903.76 in products through Graymark. (Id. ¶ 13). Graymark has not paid Bunzl the three percent rebate for that quarter.

Bunzl filed its Complaint in this Court on April 15, 2005. (Doc. No. 1). Graymark filed its Counterclaims on January 30, 2005. (Doc. No. 21). Pending before the Court are a motion to dismiss, two motions for summary judgment, and a motion for reconsideration. The matters are all fully briefed and ready for disposition.

## DISCUSSION

### I.    Motion to Reconsider

Graymark asks the Court to reconsider its May 30, 2006 decision denying its request to file amended counterclaims. (Motion to Reconsider, Doc. No. 60). On February 2, 2006, Bunzl filed its Motion to Dismiss the Counterclaims and Motion for Summary Judgment. (Doc. Nos. 25, 27). On March 17, 2006, Graymark asked the Court to amend the Case Management Order to allow it to conduct more discovery and provide additional time to respond to Bunzl's motions. (Doc. No. 36).

The reason given for the request was that Graymark's primary counsel, located in Florida,[3] had recently withdrawn with little notice. Graymark's local counsel had not been heavily involved in the case, and needed additional time. (Doc. No. 36).

Over Bunzl's opposition, the Court granted Graymark's motion, including Graymark's proposed March 31, 2006 deadline for amending the pleadings. (Amended Case Management Order, Doc. No. 45). On March 24, 2006, Bunzl filed its Motion for Summary Judgment on the Counterclaims. (Doc. No. 39). Then on April 28, 2006, Graymark moved to file amended counterclaims out of time. (Doc. No. 54). After the matter was fully briefed, the Court denied the motion on May 30, 2006. Bunzl had already filed both a motion to dismiss and a motion for summary judgment on the counterclaims, and all facts relevant to the new counterclaims had occurred well before the original counterclaims were filed.

On June 12, 2006, Graymark asked the Court to reconsider its May 30 decision. (Doc. No. 60). In support, it asserts that the counterclaims are compulsory counterclaims, the Florida counsel had failed to prepare them, and that they were not known to Graymark or its current counsel at the March 31 deadline for the amendment of pleadings. (Doc. No. 60 ¶ 5). Graymark further contends that this constitutes "oversight, inadvertence, or excusable neglect" allowing it to add omitted counterclaims under Fed. R. Civ. P. 13(f) and that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).

The justice required by Fed. R. Civ. P. 15(a) is considered for both parties. When Graymark

---

[3] Graymark initially filed its counterclaims in state court in Florida. See Bunzl Distribution USA, Inc. v. Schultz, No, 4:05 cv 605, 2005 WL 3358300 (E.D. Mo., November 19, 2005). After this Court denied Graymark's motion to dismiss this case as compulsory counterclaims to the Florida suit, the Florida judge presumably dismissed that suit. Graymark then filed its Florida claims as counterclaims in this suit.

asked to add additional counterclaims, it was a month beyond the deadline it had proposed, and Bunzl had already filed motions to dismiss and for summary judgment based on the original counterclaims. The new counterclaims raised new theories of recovery and would have necessitated additional discovery by Bunzl. While these counterclaims might be compulsory and thus lost if not asserted here,[4] had Graymark been allowed to assert them, then Bunzl would be forced to proceed to trial with no discovery and no opportunity to move for summary judgment on those claims. The Court could again amend the case management order, but declines to do so in light of the approaching trial, the previously amended case management order and numerous other extensions of time already granted. (Doc. No. 45). The alleged inaction of Graymark's prior counsel does not constitute "oversight, inadvertence, or excusable neglect" so as to allow leave to amend when that will prejudice the opposing party. See Hammer v. City of Osage Beach, Missouri, 318 F.3d 832, 844-45 (8th Cir. 2003) (upholding district court's denial of leave to amend when it "had already granted leave to amend once, and the second motion for leave to amend was filed after discovery had closed and the City had moved for summary judgment on the pleaded theories"). Furthermore, Graymark is bound by the actions, or inaction of its counsel. Boogaerts v. Bank of Bradley, 961 F.2d 765, 768 (8th Cir. 1992).

Graymark's Motion to Reconsider is denied.


## II.    Motion to Dismiss Graymark's Counterclaims

In ruling on a motion to dismiss, the Court must view the allegations in the Complaint in the light most favorable to Plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). A cause of action should not be dismissed for failure to state a claim unless, from the face of the Complaint, it appears

---

[4] This is based on the assertion of Defendants in their Motion to Reconsider, and the Court makes no ruling on this issue.

beyond a reasonable doubt that Plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Jackson Sawmill Co., Inc. v. United States, 580 F.2d 302, 306 (8th Cir. 1978). Thus, a motion to dismiss is likely to be granted "only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." Fusco v. Xerox Corp., 676 F.2d 332, 334 (8th Cir. 1982) (internal quotations and citation omitted).

Bunzl moves the Court to dismiss Graymark's Counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court will address each claim separately.

## A.  Tortious Interference with Advantageous Business Relationship

In Count I, Graymark alleges that Bunzl tortiously interfered with its business relationship with Cellynne. The specific allegations are:

> 43.  Graymark had a business relationship with Cellynne wherein Cellynne supplied product to Graymark who then supplied to Bunzl for distribution.

> 44.  Bunzl was aware of the relationship between Cellynne and Graymark.

> 45.  While Bunzl was outwardly supporting the business relationship between Cellynne and Graymark, they unjustifiably undermined Graymark and the spirit of the agreement they entered into by soliciting Cellynne and negotiating and arranging an agreement behind Graymark's back. Said conduct of advising Graymark that they would permit Cellynne to make the decision themselves as to whether to deal with Bunzl directly or through Graymark was essentially a ruse.

(Counterclaim, Doc. No. 21). Bunzl asserts that the Court must dismiss the claim for tortious interference because, since Bunzl was a party to the relationship, it cannot be liable for tortiously interfering with it. (Memorandum in Support of Motion to Dismiss, Doc. No. 26, at 5).

For Graymark to succeed in its claim of tortious interference with a business expectancy, it must prove "(1) a contract or valid business expectancy; (2) defendant's knowledge of the contract

8

or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." Nazeri v. Missouri Valley College, 860 S.W.2d 303, 316 (Mo. 1993). The party interfering with the business relationship must be a third party. Fields v. R.S.C.D.B., Inc., 865 S.W.2d 877, 879 (Mo. Ct. App. 1993). A claim for tortious interference "will lie against only a third party, not a party to the subject contract." White v. Land Clearance for Redevel. Auth., 841 S.W.2d 691, 695 (Mo. Ct. App. 1992). See also Zipper v. Health Midwest, 978 S.W.2d 398, 419 (Mo. Ct. App.1998); Century Management, Inc. v. Spring, 905 S.W.2d 109, 114 (Mo. Ct. App.1995). It is clear from the Counterclaim that Bunzl, Graymark, and Cellynne were all parties to the same contract: "Bunzl, Graymark, Cellynne, Roses and Green Bay each entered into an oral agreement whereby Bunzl would place its orders for products through Graymark." (Counterclaim, Doc. No. 21 ¶ 19).

Graymark relies on Mills v. Murray, 472 S.W.2d 6 (Mo. Ct. App. 1971), where the court held that employees subject to restrictive covenants in their employment contracts could be liable for conspiring to breach the contracts. Mills, 472 S.W.2d at 13. Although Mills has not been explicitly overruled, in light of numerous and more recent Missouri cases to the contrary, the Court declines to follow it.

Because Bunzl was a party to the contract, it cannot be liable for tortiously interfering with that contract. Bunzl's motion to dismiss Count I of the Counterclaim is granted

**B.      Breach of Oral Agreement**

Graymark next alleges that Bunzl breached the oral agreements between Graymark, Bunzl,

and the manufacturers.[5] (Counterclaim, Doc. No. 21 ¶¶ 47-50). Bunzl argues that this Count must be dismissed for two reasons. First, because as an oral agreement with no specified end date it is terminable at will by either party, and second because it was a contract for the sale of goods over $500 and is thus under the statute of frauds is unenforceable beyond goods already sold. (Memorandum in Support of Motion to Dismiss, Doc. No. 26 at 7). Graymark responds that the statute of frauds is an affirmative defense that "is not properly raised in a motion to dismiss unless the pleading affirmatively and clearly shows the conclusive applicability of such defense to bar the action." (Response to Motion to Dismiss, Doc. No. 38, at 8).

Here, the face of the Counterclaim makes clear that the Statute of Frauds applies. The contract at issue was an oral agreement for the sale of goods for the price of more than $500.[6] See Mo. Rev. Stat. § 400.2-201(1). In addition, the pleadings make no mention of any end date to the oral agreement, making it terminable at will by any party. See Sharp v. W. & W. Trucking Co., 421 S.W.2d 213, 218 (Mo. 1967) ("A contract for an indefinite period of time may be terminated at the will of either party.").

Because the contract was terminable at will by any party, Bunzl cannot be liable for breach of contract for terminating the contract. Bunzl's motion to dismiss Count II of the Counterclaim is granted.

---

[5] Specifically, Graymark alleges that Bunzl agreed with Cellynne that, as of a certain date, Bunzl would once again place orders directly with Cellynne instead of going through Graymark. (Counterclaim, Doc. No. 21 ¶ 39).

[6] Though Graymark does not state the value of the tissue products sold, it claims lost revenues in the millions of dollars. (Counterclaim, Doc. No. 21, at 10).

## C.    Breach of Fiduciary Duty

In Count III Graymark alleges that Bunzl breached its fiduciary duties towards Graymark.

Specifically, it alleges:

> 52.    Bunzl had a fiduciary duty to Graymark by virtue of their long-standing relationship, the agreement they entered into in January, 2003 and various representations Bunzl made to Graymark that they would ensure that Graymark would enjoy continued success.

> 53.    Additionally, Bunzl had a fiduciary duty to Graymark by virtue of the confidence that Graymark reposed in Bunzl and the trust accepted by Bunzl that they would ensure that Graymark would enjoy continued success.  This was further illustrated by Bunzl's insistence that Graymark essentially give up their other customers so that they could concentrate on servicing Bunzl.

> 54.    Bunzl breached the fiduciary duty by undermining Graymark's business by dealing directly with suppliers instead of through Graymark contrary to the January, 2003 agreement and convincing said supplier to do so while assuring Graymark that they would take steps to ensure Graymark would enjoy continued success.

(Counterclaim, Doc. No. 21, at 11).

Bunzl contends that Count III must be dismissed because it owed Graymark no fiduciary duty.

Specifically, Bunzl argues that a business relationship alone does not give rise to a fiduciary duty.

(Memorandum in Support of Motion to Dismiss, Doc. No. 26 at 10).

Bunzl correctly states that a fiduciary duty "is not created by a unilateral decision to repose trust and confidence; it derives from the conduct or undertaking of the purported fiduciary which is recognized by the law as justifying such reliance."  Farmers Ins. Co., Inc. v. McCarthy, 871 S.W.2d 82, 87 (Mo. Ct. App. 1994).  Graymark has, however, alleged sufficient facts to withstand a motion to dismiss.  Graymark alleges that Bunzl manipulated business relationships to ensure that Graymark had total reliance on Bunzl for its business. (Counterclaim, Doc. No. 21 ¶¶ 19-41). See Schimmer v. H. W. Freeman Const. Co., Inc., 607 S.W.2d 767, 770 (Mo. Ct. App. 1980) ("Equity does not limit the circumstances wherein a fiduciary relationship may exist but will look for those instances where

a special confidence is reposed on one side with a resulting influence on the other.").

Bunzl's motion to dismiss Count III of the Counterclaim is denied.


**D.      Fraudulent Inducement**

Graymark next alleges that Bunzl fraudulently induced it into maintaining a business relationship when Bunzl was "undermining that relationship." Graymark further alleges that it relied on the alleged fraud in investing thousands of dollars in office space and committing to a commercial lease. (Counterclaim, Doc. No. 21 ¶¶ 57-60). Bunzl argues that this Count must be dismissed because it does not plead separate facts or damages from the breach of contract claim. (Memorandum in Support of Motion to Dismiss, Doc. No. 26, at 12). Alternately, Bunzl contends that Graymark did not plead fraud with sufficient particularity. (Id. at 13).

Although Graymark could not collect damages for both fraud and breach of contract, it may plead alternative theories. Fed. R. Civ. P. 8(e)(2); Norber v. Marcotte, 134 S.W.3d 651, 661 (Mo. Ct. App. 2004) ("Although a plaintiff is entitled to proceed on various theories of recovery, he or she cannot receive duplicative damages; instead he or she must establish a separate injury on each theory.").

In addition, Graymark has pled fraud with sufficient particularity. Although the allegations pled in Count IV for fraud are conclusory, the count also incorporates the other paragraphs of the Counterclaim. (Counterclaim, Doc. No. 21 ¶ 56). Review of the entire Counterclaim shows that Graymark has pled all of the facts necessary for fraud.

Bunzl's motion to dismiss Count IV of the Counterclaim is denied.

**E.     Conspiracy**

In Count V, Graymark alleges that "Bunzl conspired with Cellynne to tortiously interfere with Graymark's relationship with Cellynne and then with Cellynne officials to cut Graymark out of the stream of revenue between Cellynne and Bunzl." (Counterclaim, Doc. No. 21 ¶ 62). Bunzl contends that Count V must be dismissed because "[t]here can be no independent tort of 'conspiracy', except in such an unusual case where the mere force of numbers, acting in unison, makes a wrong, of which exceptional circumstances there is no evidence in this case." See Baucke v. Adams, 188 S.W.2d 355, 366-67 (Mo. Ct. App. 1945). Bunzl further argues that the claim for conspiracy cannot lie here because one or both of the alleged conspirators could have unilaterally terminated the oral agreement. (Memorandum in Support of Motion to Dismiss, Doc. No. 26, at 14-15).

"A 'civil conspiracy' is an agreement or understanding between two [or more] persons to do an unlawful act, or to use unlawful means to do an act which is lawful." Ritterbusch v. Holt, 789 S.W.2d 491, 494 (Mo. 1990). "The gist of the action is not the conspiracy, but the wrong done by acts in furtherance of the conspiracy or concerted design resulting in damage to plaintiff." Royster v. Baker, 365 S.W.2d 496, 499 (Mo. 1963).

Graymark has not specified the underlying unlawful act, but from the allegations, it is either breach of contract or tortious interference. (Counterclaim, Doc. No. 21 ¶¶ 61-68). As discussed above, Bunzl cannot be liable for tortiously interfering with a contract to which it was a party, or for breaching a contract which was terminable at will. Graymark has not alleged an unlawful act, so it cannot assert a claim for conspiracy.

Bunzl's motion to dismiss Count V of the Counterclaim is granted.

**III.     Motion for Summary Judgment on Graymark's Counterclaims**

Bunzl moves for summary judgment on all of Graymark's counterclaims. (Motion for Summary Judgment, Doc. No. 39). Because the Court has dismissed Counts I, II and V, it will only address Counts III and IV.

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleading. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Id. at 255. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Id. at 249.

**A.      Breach of Fiduciary Duty**

Bunzl contends that because there is no evidence that it owed a fiduciary duty to Graymark, it cannot be liable for breach of fiduciary duty. Graymark responds that Bunzl's fiduciary duty "arose from the longstanding relationship ... between Bunzl, the Schultzs and Graymark." (Memorandum in Opposition, Doc. No. 61, at 10).

The elements of a cause of action for breach of fiduciary duty are: "(1) the existence of a fiduciary relationship between the parties, (2) a breach of the fiduciary duty, (3) causation, and (4) harm." Grewell v. State Farm Mut. Auto. Ins. Co., 162 S.W.3d 503, 508 (Mo. Ct. App. 2005). "A fiduciary relationship may arise as a matter of law by virtue of the parties' relationship, e.g., attorney-client, or it may arise as a result of the special circumstances of the parties' relationship where one places trust in another so that the latter gains superiority and influence over the former." Shervin v. Huntleigh Securities Corp., 85 S.W.3d 737, 740-41 (Mo. Ct. App. 2002). Missouri courts have identified basic elements which are generally necessary to the establishment of a fiduciary relationship:

> (1) as between the parties, one must be subservient to the dominant mind and will of the other as a result of age, state of health, illiteracy, mental disability, or ignorance; (2) things of value such as land, monies, a business, or other things of value which are the property of the subservient person must be possessed or managed by the dominant party; (3) there must be a surrender of independence by the subservient party to the dominant party; (4) there must be an automatic or habitual manipulation of the actions of the subservient party by the dominant party; and (5) there must be a showing that the subservient party places a trust and confidence in the dominant party.

Chmieleski v. City Products Corp., 660 S.W.2d 275, 294 (Mo. Ct. App. 1983). A fiduciary relationship need not include all of these elements. A.G. Edwards & Sons, Inc. v. Drew, 978 S.W.2d 386, 394 (Mo. Ct. App. 1998). The existence of a business relationship does not, in itself, give rise to a fiduciary relationship. C & J Delivery, Inc. v. Emery Air Freight Corp., 647 F.Supp. 867, 875 (E.D. Mo. 1986). "[I]n most instances where a fiduciary relationship has been held to have existed

from business relations, such findings have been in conformity with statutory requirements, or in furtherance of public policy." Chmieleski, 660 S.W.2d at 294-95.

Bunzl contends that Graymark has put forth no evidence that Graymark was not fully in control of its own business decisions. The Court disagrees. Although vague and conclusory, Graymark has put forth evidence of four of the five elements: (2) that Bunzl, the allegedly dominant party, managed Graymark's business (Schultz Affidavit, Doc. No. 42, attached exh. ¶¶ 28-29); (3) that Graymark surrendered its independence to Bunzl (Id.); (4) that there was a pattern of control over Graymark (Id. ¶ 29); and (5) that Graymark placed trust and confidence in Bunzl (Id. ¶¶ 27-29; Schultz Affidavit, Doc. No. 62, attached exh. A ¶¶ 17). The Court finds Chmieleski illustrative. In Chmieleski, the Missouri Court of Appeals reversed a jury verdict finding a breach of fiduciary duty in a franchise relationship. Chmieleski, 660 S.W.2d at 294-95. In explaining why there was no fiduciary relationship, the court pointed to a lack of evidence that the franchisor ran the store on a daily basis or was involved in management decisions of the franchisee. Chmieleski, 660 S.W.2d at 294. Here, there is evidence, although conclusory, that Bunzl was involved in the day-to-day operations of Graymark and participated in management decisions. There is insufficient evidence in the record to determine whether Bunzl owed a fiduciary duty to Graymark.

The inquiry does not end here. There are three other elements of breach of fiduciary duty: breach, causation, and harm. Graymark alleges that Bunzl "breached the fiduciary duty by undermining Graymark's business by dealing directly with suppliers instead of through Graymark contrary to the January, 2003 agreement and convincing said suppliers to do so while assuring Graymark that they would take steps to ensure that Graymark would enjoy continued success." (Counterclaim, Doc. No. 21 ¶ 54).

Graymark asserts that Bunzl knew how important Cellynne was to its business, and yet in

January, 2005, Bunzl began dealing with Cellynne directly, "despite [Bunzl's] knowledge of [Graymark's] reliance on Cellynne's" business. (Schultz Affidavit, Doc. No. 62, attached exh. A ¶¶ 39, 42). Bunzl concedes that, as of January 1, 2005, it began dealing directly with Cellynne. (Zatkulak Affidavit, Doc. No. 41, attached exh. C ¶¶ 14, 16). Again, there is insufficient evidence in the record to determine if there was a breach of the alleged fiduciary duty.

Graymark further asserts that because all of its "income was derived from [the arrangement with Bunzl, Defendants] have been driven to the brink of insolvency and have suffered severe financial hardships and setbacks." (Schultz Affidavit, Doc. No. 62, attached exh. A ¶ 44). This is sufficient to show an issue of fact as to the causation and harm elements.

Bunzl's Motion for Summary Judgment on Count III of the Counterclaim is denied.

## B. Fraudulent Inducement

In Count IV, Graymark alleges that Bunzl fraudulently induced it to modify the January 2003 arrangement in 2005. Graymark contends that, in 2004, Bunzl told Graymark that they would need to revise their agreement, that Bunzl had received numerous complaints from the suppliers, and that Graymark must submit a revised business plan. (Counterclaim, Doc. No. 21 ¶ 32). For Graymark, the most important element of the revised agreement was that its relationship with Cellynne would continue. (Id. ¶ 36). The revised agreement also provided that Graymark would no longer work with Roses or Green Bay, the other two suppliers. (Id. ¶ 37). Graymark asserts that without Graymark's knowledge, Bunzl then "met with Cellynne officials and negotiated an agreement with Cellynne which would include Cellynne breaching its contract with Graymark and accepting orders directly from Bunzl beginning January 1, 2005." (Id. ¶ 39). Bunzl contends that because Graymark entered into the agreement in 2003, its 2004 statements could not constitute fraud. (Reply Memorandum, Doc.

No. 64, at 13-14).

> The elements of a claim of fraud are:
>
> (1) that agents of [plaintiff] made certain material representations to defendants, (2) such representations were false when made, (3) the agents making the representations knew they were false, (4) the representations were made with the purpose of deceiving defendants, (5) defendants were, in fact, deceived, (6) defendants reasonably relied on the representations ..., and (7) defendants suffered damage as a proximate result of the fraudulent misrepresentations.

Trotter's Corp. v. Ringleader Rest., Inc., 929 S.W.2d 935, 939 (Mo. Ct. App.1996).

There are two time periods upon which Graymark's fraud claim could be based.[7]  The first is the inception of the January 2003 agreement.  The second is the time of the modification of that agreement, in late 2004.  The Court will address both possibilities.

There is no evidence that Bunzl fraudulently induced Graymark into entering into the January 2003 agreement.  Bunzl submits the affidavit of Tom Zatkulak, Vice-President for Corporate Procurement for Bunzl.  (Zatkulak Affidavit, Doc. No. 41, attached exh. C ¶ 2).  He states that "[w]hen Bunzl entered into the oral agreements in 2003, it intended to perform its obligations under the oral agreements." (Zatkulak Affidavit, Doc. No. 41, attached exh. C ¶ 10). Graymark submits nothing to the contrary, and in fact concedes that Bunzl did perform its obligations under the 2003 agreement for 2003 and much of 2004. (Schultz Affidavit, Doc. No. 61, attached exh. A ¶¶ 34-35). Because Bunzl did not intend to make false representations to induce Graymark to enter into the 2003 agreement, it cannot not be liable for fraudulent inducement.

Graymark asserts that Bunzl fraudulently induced it to modify the 2003 agreement in late 2004.  As part of this modification, Graymark voluntarily relinquished its business with Green Bay

---

[7] From the pleading and briefs, Graymark seems to refer to the 2004 statements.  Bunzl, however, discusses the 2003 statements.

and Roses. (Schultz Affidavit, Doc. No. 62, attached exh. A ¶ 39). It asserts that a Bunzl executive assured it that "Bunzl would not let... Graymark tissue be harmed." (Schultz Affidavit, Doc. No. 32, attached exh. A ¶ 38). It further asserts:

> 40. Zatkulak further advised us that we would have to contact Cellynne ourselves to persuade them to continue the January 2003 arrangement, and stated that the situation was largely out of his hands, in spite of the relationship of trust and confidence we had developed over the years with Bunzl....

> 41. Since that time, we discovered that Bunzl conducted secret discussions with its branches and the value tissue suppliers, and had designs to cut us entirely out of the Janaury 2003 arrangement so that Bunzl could resume dealing directly with the value tissue suppliers. Zatkulak denied ever having these discussions when we confronted him with our discovery.

> 42. Starting January 1, 2005, Bunzl began dealing with the value tissue suppliers directly, including Cellynne, despite its knowledge of our reliance on Cellynne's participation in the revised business plan.

(Schultz Affidavit, Doc. No. 62, attached exh. A).

Because Graymark concedes that it voluntarily terminated its relationship with Green Bay and Roses, it can only complain of the termination of the relationship with Cellynne. The Court first notes that the relevant evidence Graymark submits on this issue is inadmissible hearsay, and thus cannot be considered on a motion for summary judgment. Fed. R. Evid. 802, 801(d)(2); Fed. R. Civ. P. 56(e). Graymark also submits a number of emails between Bunzl, the suppliers, and John Schultz, many of which are also potentially inadmissible. Even if the Court does consider this evidence, it does not constitute fraud.

Although Zatkulak told Graymark that it would not be harmed, he also told it that, to continue dealing with Cellynne, Graymark would need to negotiate directly with the supplier. There is no evidence, admissible or otherwise, to show that Bunzl interfered with Graymark's relationship with Cellynne. The affidavit contains only the broad and vague statement that "Bunzl conducted secret

discussions with its branches and the value tissue suppliers." (Schultz Affidavit, Doc. No. 62, attached exh. A ¶ 41). The emails merely tell suppliers, including presumably Cellynne,[8] that they have the option of continuing to work with Graymark, but may also deal directly with Bunzl. (Emails, Doc. No. 62, Attached exhs. F-N).

Graymark fails on several elements of its claim of fraud. Bunzl assured Graymark that Graymark would not be harmed, but also told it that it must negotiate its own agreement with Cellynne, and that the situation was out of Bunzl's hands. (Schultz Affidavit, Doc. No. 62, attached exh. A, ¶¶ 38, 40). This fails to prove the first four elements. Furthermore, Graymark has not shown reliance or damage. Because the contract was terminable at the will of any party, Bunzl or the supplier could have terminated the contract at any time. The submitted emails show that the suppliers were unhappy with the 2003 arrangement and wished to terminate it. (Emails, Doc. No. 62, Attached exhs. F, H, I). Because the suppliers wished to terminate the agreement, Graymark has shown no damage proximately caused by the alleged fraud. In addition, there is no evidence to support reliance.

Bunzl's Motion for Summary Judgment on Count IV of the Counterclaim is granted.

## IV.    **Motion for Summary Judgment on Bunzl's Complaint**

Bunzl has also moved for summary judgment on all counts of its Complaint. (Doc. No. 27). Count I is for breach of the indemnity agreement, Count II is for payment of the $600,000 allegedly owed under the indemnity agreement based on principles of reimbursement, unjust enrichment, and subrogation, and Count III is for payment of the rebates allegedly due under the oral agreement. The Court will address each count separately.

_____

[8] Cellynne is referred to as StefCo or SteffCo in the emails. See Complaint, Doc. No. 1 ¶ 11).

**A.      Breach of Indemnity Agreement**

Bunzl first argues that the Schultz Defendants owe it $600,000 under the Indemnity Agreement.  As discussed above, in connection with the January 2003 agreement, Bunzl signed written Guaranties in favor of each of the vendors, guaranteeing "payment of and collection by Vendor all of the amounts properly due and payable to Vendor by Graymark for Products sold and delivered to Bunzl...." (Guaranty, Doc. No. 1, attached exh. 1).  The Schultz Defendants signed an Indemnity Agreement, agreeing to personally "defend, indemnify, and hold Bunzl harmless from and against all claims, demands, costs, expenses and liabilities ... incurred by Bunzl under or in connection with the Bunzl Guaranties." (Indemnity Agreement, Doc. No. 1, attached exh. 1).

Bunzl paid Cellynne $500,000 and Roses $100,000 under their Guaranties.  (Zatkulak Affidavit, Doc. No. 29, attached exh. A ¶¶ 10-11).  Bunzl now seeks indemnification from the Schultz Defendants of those amounts.   The Schultz Defendants respond that summary judgment must be denied for two reasons: because the Indemnity Agreement was signed under duress and thus is invalid, and because Bunzl has not established a breach of the Indemnity Agreement.

1.      Duress

The Schultz Defendants first assert that the Indemnity Agreement is invalid because it was entered into under economic duress.  They argue that if they had not signed it, Graymark Tissue would have gone out of business, they would have had no income, and would have been forced to lay off their employees. (Memorandum in Opposition, Doc. No. 42, at 6).

Florida[9] recognizes the defense of economic duress.  The elements of the defense are: "(1)

_____

[9] Florida law governs Count I because the Indemnity Agreement provides that it "shall be construed, interpreted, and enforced in accordance [with the law] of the State of Florida."

wrongful acts or threats, (2) financial distress caused by the wrongful acts or threats, and (3) absence of a reasonable alternative course of action." <u>Amoco Oil Co. v. Gomez</u>, 125 F.Supp. 2d 492, 503 (S.D. Fla. 2000). The party asserting duress "bears the burden of creating a fact issue with respect to a claim of duress." <u>McLaughlin v. State Dept. of Natural Resources</u>, 526 So.2d 934, 936 (Fla. Ct. App. 1988). The Schultz Defendants have failed to provide any evidence to support their claim of duress.

First, they have not alleged any wrongful acts by Bunzl. All of Bunzl's actions were standard elements of contract negotiation. Furthermore, the Defendants' own evidence points to a reasonable alternative course of action: they "were therefore faced with the decision to either secure more business from Bunzl or resume working directly with Economy as [they] did prior to the arrangement." (Schultz Affidavit, Doc. No. 62, attached exh. A ¶ 23). Instead of signing the Indemnity Agreement, the Schultzes could have chosen to go back to the old relationship with Economy.

Because they have alleged no wrongful acts, and had a reasonable alternative course of action, the Schultz Defendants have not succeeded in establishing their defense of duress.


2.    <u>Breach of the Indemnity Agreement</u>

The Schultz Defendants next assert that Bunzl has not proven that the payments were "under or in connection with the Bunzl Guaranties" because it has not shown that its obligations under the Guaranties were triggered. (Memorandum in Opposition, Doc. No. 42, at 6). They argue that there is no evidence that the $600,000 was for "amounts properly due and payable to the manufacturers

_____

(Complaint, Doc. No. 1, attached exh. 1, at 2).

by Graymark," or that the notice condition in the Cellynne Guaranty was fulfilled. (Id. at 6-7).

Bunzl replies that there is no genuine dispute that "Bunzl's payments to Cellynne and Roses were for products of Cellynne and Roses: (a) that Graymark bought from Cellynne and Roses and resold to Bunzl; and (b) for which Graymark did not pay Cellynne and Roses." (Reply Memorandum, Doc. No. 49, at 8).

The Court finds no genuine issue of fact as to the $500,000 payment. Graymark admits that it owed Cellynne $500,000 for products that Graymark ordered and received.[10] (Defendant's Responses to Plaintiff's First Request for Admissions, Doc. No. 29, attached exh. B ¶¶ 21). Bunzl submits an affidavit stating:

> 10.    In 2005, pursuant to the Bunzl Guaranty between Bunzl and Cellynne, Cellynne demanded that Bunzl pay Cellynne the amounts that Graymark owed to Cellynne for products that Graymark ordered and received from Cellynne, but for which Graymark did not pay Cellynne. Bunzl paid $500,000 to Cellynne in response to its demand.

(Zatkulak Affidavit, Doc. No. 29, attached exh. A).

There is evidence here that Bunzl was obligated to pay under the Guaranty. Graymark owed Cellynne $500,000 for products that Graymark ordered and received. (Defendant's Responses to Plaintiff's First Request for Admissions, Doc. No. 29, attached exh. B ¶ 21). Cellynne demanded payment of the $500,000 from Bunzl. (Zatkulak Affidavit, Doc. No. 29, attached exh. A ¶ 10). Bunzl paid Cellynne. (Id.).

---

[10] Bunzl submits Graymark's responses to its requests for admissions:

21.    At the time that Bunzl made [the 2005 payment to Cellynne], Graymark owed Cellynne Corporation in excess of $500,000 for products that Graymark ordered and received from Cellynne Corporation.
      RESPONSE: Admitted.

(Defendant's Responses to Plaintiff's First Request for Admissions, Doc. No. 29, attached exh. B).

The Schultz Defendants also argue that Cellynne breached the notice provision of the Bunzl Guaranty, meaning that Bunzl was not obligated to pay under the Guaranty. The Cellynne Guaranty, but not the Roses Guaranty, contains the following provision: "Bunzl's obligations under this Guaranty are conditioned on Vendor notifying Bunzl in writing within five (5) business days after Graymark fails to timely make any payment due to Vendor." (Cellynne Guaranty, Doc. No. 1, attached exh. 1, at 4). There is no evidence in the record that Cellynne complied with this provision.

Written notice requirements can be waived by agreement or conduct of the parties. See JTL Consulting, L.L.C. v. Shanahan, 190 S.W.3d 389, 396 (Mo. Ct. App. 2006) ("Parties to a contract may waive the provisions of their contract by their conduct."). Bunzl was free to waive the written notice requirement, but since Graymark is not a party to the Cellynne Guaranty, its consent is not required for the waiver to be valid.

There is an issue of fact, however, as to Graymark's liability for the $100,000 payment to Roses. Graymark denies that the money it owes Roses is for products ordered and received.[11] (Defendant's Responses to Plaintiff's First Request for Admissions, Doc. No. 29, attached exh. B ¶ 23). Thus, the evidence before the Court shows that Roses demanded payment from Bunzl of $100,000 for products ordered and received,[12] and Graymark owed Roses $100,000 for an unknown

---

[11] Graymark's Response to Bunzl's First Request for Admission reads:

23.     At the time that Bunzl made [the 2005 payment to Roses], Graymark owed Roses Southwest Papers, Inc. in excess of $100,000 for products that Graymark ordered and received from Roses Southwest Papers, Inc.
        RESPONSE:  Admitted as to the stated approximate amount of monies owed by Graymark to Roses Southwest. Denied as to all remaining allegations.

(Defendant's Responses to Plaintiff's First Request for Admissions, Doc. No. 29, attached exh. B).

[12] The Zatkulak affidavit states:

reason.

The Court finds that there is no issue of material fact as to the Schultz Defendants' liability under the Indemnity Agreement for the $500,000 Cellynne payment, but there is an issue of fact as to the $100,000 Roses payment.

Bunzl's Motion for Summary Judgment on Count I is granted in part and denied in part.


**B.     Unjust Enrichment**

In Count II, Bunzl seeks, under principles of unjust enrichment, reimbursement, and subrogation, to collect from Graymark the $600,000 that it paid to Cellynne and Roses under the Guaranties. Because of the Court's ruling on Count I, this claim is now moot as to the $500,000 Cellynne payment. Bunzl may plead alternative theories of recovery, but it may not collect on both. Norber, 134 S.W.3d at 661.

Count II must be denied as to the $100,000 Roses payment for the same reasons as stated above.  There is an issue of fact of whether the $100,000 Bunzl paid to Roses was for products ordered and received.

Bunzl's Motion for Summary Judgment on Count II is denied.


**C.     Payment of Rebates**

Under the January 2003 agreement, the Vendors paid Graymark a six percent rebate.

---

11.     In 2005, pursuant to the Bunzl Guaranty between Bunzl and Roses, Roses demanded that Bunzl pay Roses the amounts that Graymark owed to Roses for products that Graymark ordered and received from Roses, but for which Graymark did not pay Roses. Bunzl paid $100,000 to Roses in response to its demand.

(Zatkulak Affidavit, Doc. No. 29, attached exh. A).

Graymark kept three percent as a commission and paid the other three percent to Bunzl. In Count III, Bunzl asserts that Graymark owes it $133,870.79 in rebates for the fourth quarter of 2004.

Graymark responds that under the 2003 agreement Bunzl's payments to Graymark were to include a two percent cash discount, and that there is no evidence that the two percent discount was satisfied for all of the orders allegedly due under the rebate program.

However, in its Responses to Bunzl's Request for Admissions, Graymark admitted that it "owes $133,870.79 to Bunzl for rebates for the fourth quarter of 2004." (Defendant's Responses to Plaintiff's First Request for Admissions, Doc. No. 29, attached exh. B ¶ 28). Graymark cannot admit that it owes an amount and then later dispute that amount.

Bunzl's Motion for Summary Judgment on Count III of the Complaint is granted.

### D.  Prejudgment Interest

Lastly, Bunzl asserts that it is entitled to prejudgment interest on its claims, dating back to April 15, 2005, the date the case was commenced. Graymark does not dispute this. Both Florida and Missouri law provide for nine percent interest per year. Fla. Stat. ch. 55.03; Florida Department of Financial Services, Statutory Interest Rates Pursuant to s. 55.03, Florida Statutes, available at http://www.fldfs.com/aadir/interest.htm (last visited August 7, 2006); Mo. Rev. Stat. § 408.020.

On the $500,000 claim, the prejudgment interest is $123.29 per day ($500,000 times 0.09 divided by 365) for 479 days. This comes out to $59,055.91 prejudgment interest on the $500,000 claim.

On the $133,870.79 claim, the prejudgment interest is $33.01 per day ($133,870.79 times 0.09 divided by 365) for 479 days. This comes out to $15,811.79 prejudgment interest on Count III, for a total prejudgment interest of $74,867.70.

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that the Schultz Defendants' Motion for Reconsideration (Doc. No. 60) is **DENIED**.

**IT IS FURTHER ORDERED** that Counterclaim Defendant Bunzl Distribution Inc.'s Motion to Dismiss Counts I, II, and V (Doc. No. 25) is **GRANTED**.

**IT IS FURTHER ORDERED** that Counterclaim Defendant Bunzl Distribution Inc.'s Motion to Dismiss Counts III and IV of the Counterclaim (Doc. No. 25) is **DENIED**.

**IT IS FURTHER ORDERED** that Counterclaim Defendant Bunzl Distribution's Motion for Summary Judgment on Count III of the Counterclaim (Doc. No. 39) is **DENIED**.

**IT IS FURTHER ORDERED** that Counterclaim Defendant Bunzl Distribution's Motion for Summary Judgment on Count IV of the Counterclaim (Doc. No. 39) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff Bunzl's Motion for Summary Judgment on Count I of the Complaint (Doc. No. 27) is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that Plaintiff Bunzl Distribution's Motion for Summary Judgment on Count II of the Complaint (Doc. No. 27) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff Bunzl Distribution's Motion for Summary Judgment on Count III of the Complaint (Doc. No. 27) is **GRANTED**.


Dated this 7th day of August, 2006.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE